IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA )  | | |
| Plaintiff, ) | | |
| v. ) | No. 19 CR 00348-1 | |
| ) | Emergency Judge Kennelly | |
| JOEL HARRIS ) | | |
| Defendant ) | | |

**REPLY TO GOVERNMENT'S RESPONSE TO
EMERGENCY MOTION FOR RELEASE ON BAIL**

The defendant, Joel Harris, is seeking his release on bail due to the Covid-19 emergency, his conditions of confinement, and his high-risk characteristics. The government has filed a response in which they assert; (1) that neither 18 U.S.C. 3142 nor any other statute gives this court the authority to release the defendant on bail because he has pled guilty and is awaiting sentencing; (2) that Joel Harris's history and characteristics and the nature of the offense make him a flight risk and a danger to the community; and (3) that there is no imminent danger to his health because in the government's view the Bureau of Prisons Covid-19 Action Plan alleviates any risk. All three of these positions are wrong, as will be shown below.

**I. THE COURT HAS THE AUTHORITY TO TEMPORARILY RESCIND
DETENTION UNDER 18 U.S.C. §3142(i)**

This Court has the authority to release the defendant on bail under 18 U.S.C. §3142(i). The argument for this proposition was well stated in *United States v. Kennedy*, No 18-20315, 2020 WL 1493481 (E.D. Mich. March 27,

2020). In that case, a magistrate judge applied that statute to a defendant who had been convicted but not yet sentenced. The government appealed, and the District court stated "Where a detention order has been issued, the Court is permitted to issue a 'subsequent order' temporarily releasing an individual in custody 'to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason.' 18 U.S.C. § 3142(i)(4). While the language of § 3142(i)(4) appears under the heading 'Release or detention of a defendant pending trial,' this provision applies to Defendant even though he has pled guilty and is thus pending sentencing rather than trial. The language specifies that the Court may permit temporary release 'by subsequent order.' Id. The Court's current directive is a 'subsequent order,' issued subsequent to a prior detainment order under 18 U.S.C. § 3142. *United States v. Thornton*, 787 F.2d 594, 594 (6th Cir. 1986) (Table decision) (suggesting that a district court could temporarily release a detainee pursuant to § 3142(i)(4) by subsequent order even after a prior order holding that the detainee was a flight risk or a risk to public safety); *United States v. Dante Stephens*, No. 15-cr-0095, 2020 WL 1295155, *3 (S.D.N.Y. Mar. 19, 2020) (holding that 18 U.S.C. § 3142(i)(4) constitutes a 'separate statutory ground' for post-conviction release)." Simply put, a court has the authority to modify its own order of detention, and does not lose that authority just because the defendant pleads guilty. Nothing in 18 U.S.C. § 3142(i) contradicts this proposition.

The *Kennedy* court is not alone in this interpretation. In *United States v. Michaels*, 16 CR 00076-JVS, (CD Cal. March 26, 2020), a District court judge for the Central District of California granted bail to a defendant after he had been convicted following a jury trial citing to his age, health and Covid-19 risks. In *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020), the court ordered post-plea, pre-sentence release of the defendant with three pending assault charges due to extraordinary danger Covid-19 poses to folks in detention. The Covid-19 crisis is unprecedented and recent, so it is reasonable to expect more cases to arise in which defendants are released between plea and sentencing.

### II.     The Section 3142(g) Factors Support Joel Harris's Release

**1. The nature and circumstance of the offense charged**

Joel Harris pled guilty to one count of Theft of Government Funds under 18 U.S.C. §641. It is a non-violent crime. It also occurred under circumstances that will not be repeated.

**2. Joel Harris is not a danger to the community or a flight risk**

Both the Pretrial Service's report and the government argue that criminal history that is over 30 years old should be given substantial weight. The opposite is true. As a very young man, Joel Harris was involved in a violent crime. Today, he is 50 years old. He has not committed an act of violence since he was 19-not while in prison and not after his release. Therefore, he should not be considered a danger to the community. In addition, his prior bond forfeitures are also over 30 years old. Since that time he has appeared at

numerous court dates. Furthermore, the Pretrial Service's report details strong ties to the community. His girlfriend, his six year-old daughter and his two half-brothers are all in the Chicago area. He does not possess a passport. The reasonable conclusion to draw is that he is not a flight risk.

The prosecution may argue that what they refer to as the "anticipated Sentencing Guidelines range" of 77 to 96 months gives Joel Harris an incentive to flee. This is the range in the Presentence Report. However, the anticipated Sentencing Guidelines range in the plea agreement is 57 to 71 months. The defense intends to argue that this is the correct range. The defense also intends to argue for a lower sentence than that range.

### 3. Joel Harris's History and Characteristics show compelling reasons for his release[1]

Joel Harris is a 50 year-old African-American man. He suffers from hypertension, high blood pressure, and kidney disease. These characteristics make him a high risk to contract and possibly die from the Covid-19 virus. This is especially true if he is incarcerated.

### a. Prisoners have greater risk of contracting the Covid-19 virus

Even in the best of times, prisons and jails have "long been known to be associated with high transmission probabilities of infectious diseases." Incarcerated individuals "are at special risk of infection" and "infection control is challenging." Prisons and jails "contain high concentrations of people in

---

[1] See Federal Defender Letter to Attorney General William Barr, April 1, 2020 at https://www.fd.org/sites/default/files/covid19/other_resources/defender_letter_ag_barr_re_covid-19_4-1-20.pdf

close proximity and are breeding grounds for uncontrolled transmission [of infection].[2] The Bureau of Prisons, including the Chicago M.C.C., suffers from this risk, just like other jails and prisons.[3] On March 23, 2020, the Centers for Disease Control and Prevention (CDC) acknowledged that correctional and detention facilities present unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correctiondetention/guidance-correctional-detention.html. Specifically, the CDC noted that many detention conditions create a heightened risk of danger to detainees. These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing). Id. The CDC recommended that all correctional facilities take preventative measures, including: ensuring an adequate supply hygiene and medical supplies, allowing for alcohol-based sanitizer throughout facilities, providing

---

[2] Letter from Dr. Sandro Galea, Dean, Boston University School of Public Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to- Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions) ("Public Health Experts' Letter").

[3] See Laura M. Maruschak et al., Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012, U.S. Dep't of Justice, Ofc. of Justice Programs, Bureau of Justice Statistics (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

no-cost soap to all inmates for frequent handwashing, cleaning and disinfecting frequently touched surfaces several times per day, performing pre-intake screening and temperature checks for all new entrants, increasing space between all detained persons to at least six feet, staggering meals, and having healthcare staff perform regular rounds. Id. Research shows that prisoners and jail inmates are more likely than the general population to report experiencing infectious diseases, indicating that these individuals face a heightened risk during this pandemic.[4]

In addition, Attorney General William Barr has recognized the safety issues of detained defendants. In March 26, 2020, Attorney General Barr issued a separate directive ordering the Director of the Bureau of Prisons to "prioritiz[e] home confinement as appropriate in response to the COVID-19 pandemic . . . to protect the health and safety of BOP personnel and the people in our custody." (See "Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic," Att'y Gen. (Mar. 26, 2020)).

As of April 9, 2020, there are 283 federal inmates and 125 BOP staff who have confirmed positive test results for COVID-19 nationwide.[5] There have been eight deaths in custody.[6] Even these numbers have limitations, because there are huge numbers of prisoners who have not been tested, a large number of people with the virus do not show symptoms, and they do not account for

---

[4] Laura M. Maruschak et al., Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12, U.S. Department of Justice, Bureau of Justice Statistics, (2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.
[5] See Bureau of Prisons Covid Response page at https://www.bop.gov/coronavirus/
[6] Id.

prisoners who were diagnosed shortly after their release, or who are released right before death from the Covid-19 virus. See, e.g., *United States v. Stutson*, No. 2:93-cr-152 (N.D. Ala. Mar. 31, 2020).

### b. Prisoners in the Chicago M.C.C. are not safe

The government's response touts the Federal Bureau of Prisons COVID-19 Action Plan as reason to believe that prisoners in the Chicago M.C.C. are safe. The court should reject this assertion. First, the national plan and the M.C.C. plan are the same plan. This has resulted in at least 283 inmates contracting the virus and at least eight dying, though as stated above those numbers are almost certainly low.

Second, if he is given an opportunity to testify, Joel Harris will describe an unsafe environment where he is required to be in close contact with many other inmates, where he must share things like a phone or a computer, and where the institution is slow to implement safety measures. For example, inmates were issued masks for the first time on April 6, 2020.

Third, the Department of Justice's claim that its jails, including the Chicago M.C.C., are safe during the COVID-19 Pandemic is unreliable. In pleadings across the country, federal prosecutors have assured courts not only that the situation in BOP facilities is under control but that detention in BOP facilities is safer than release to the community. Across jurisdictions, and regardless of the facility in question, DOJ's asserts that its jails and prisons have comprehensive precautionary measures in place to prevent the transmission of COVID-19, and in any case, are well-equipped to deliver care.

The same argument is made in this case for the Chicago M.C.C.. BOP's modified operations policy, even as written, is woefully inadequate.[7] The protocol is deficient in several ways. First, the modified operations do not sufficiently address presymptomatic spread of COVID-19 among staffers, contractors, and inmates. For example, only BOP staff at medical referral centers or in areas of the country with "sustained community transmission" are subjected to "[e]nhanced screening." And this "enhanced screening" only requires temperature checks and self-reporting—it does not require staff to disclose whether they have been in high risk areas or venues or exposed to other symptomatic people. Since most COVID-19 transmission occurs pre-symptomatically, and some people show no symptoms at all, these "enhanced screenings" are simply inadequate.[8] The screening tool used for prison contractors is similarly defective.[9]

---

[7] See Fed. Bureau of Prisons, Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited on March 31, 2020).

[8] See European Centre for Disease Prevention and Control, Rapid Risk Assessment: Coronavirus Disease 2019 (COVID-19) Pandemic: Increased Transmission in the EU/EEA and the UK – Seventh Update (Mar. 25, 2020), https://www.ecdc.europa.eu/en/publications-data/rapid-risk-assessment-coronavirus-disease-2019-covid-19-pandemic ("[t]he proportion of pre-symptomatic transmission [has been] estimated to be around 48% to 62%"); see also Sam Whitehead, CDC Director on Models For the Months to Come: 'This Virus is Going to Be With Us,' NPR (Mar. 31, 2020), https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-tocome-this-virus-is-going-to-be-with-us ("[W]e have pretty much confirmed [ ] that a significant number of individuals that are infected actually remain asymptomatic. That may be as many as 25%.").

[9] See Fed. Bureau of Prisons, Visitor/Volunteer/Contractor COVID-19 Screening Tool, https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf (last visited Apr. 1, 2020); For example, the contractor screening tool asks contractors whether they have traveled to several foreign locations including South Korea (9,887 confirmed cases), or Japan (2,178 confirmed cases) in the last 14 days. It does not bother to screen for those who have traveled to, for instance, Spain (102,136 cases), Germany (72,383 cases), or elsewhere in the United States (189,633 cases). See COVID-19 Map – Johns Hopkins Coronavirus Resource Center, Johns Hopkins University & Medicine, https://coronavirus.jhu.edu/map.html (last visited Apr. 1, 2020). This tool also fails to screen for pre-symptomatic spread or whether contractors are

The representations of the DOJ are also suspect due to lawsuits filed by staff at multiple BOP locations.[10] Staffers also recount inadequate safety measures. The New York Times "spoke with more than a dozen workers in the Bureau of Prisons," who reported that "federal prisons are ill-prepared for a coronavirus outbreak. Many lack basic supplies like masks, hand sanitizer, and soap."[11] A BOP employee in Atlanta explained that staff does not have enough gloves, masks, or other supplies to respond to this outbreak.[12] They also do not "have enough space to properly quarantine inmates."[13] If BOP staff in many other cities are at risk after implementing the same plan used in the

---

practicing social distancing. BOP provides conflicting information about inmate screening. It claims to require all newly admitted asymptomatic inmates to be quarantined for at least 14 days. See Fed. Bureau of Prisons, BOP – COVID-19 Action Plan: Phase 5, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 1, 2020) (Background on Phases 1-4). But the inmate screening tool does not reflect this process: instead directing staff to conduct "normal intake" so long as an inmate has not traveled to a CDC-determined risk location or had close contact with anyone diagnosed with COVID-19 in the last 14 days. See Fed. Bureau of Prisons, Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool, https://www.bop.gov/coronavirus/docs/covid19_inmate_screening_tool_20200202.pdf (last visited Apr. 1, 2020). Phase 5 of BOP's COVID-19 Action Plan, effective today, purports to significantly decrease inmate movement by requiring that incarcerated individuals at every institution be "secured in their assigned cells/quarters." See BOP – COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. But this plan does not appear to correct the defective screenings of staff, contractors or inmates, nor does it change the reality that individuals remain in close quarters—still sharing living space, bathrooms, showers, laundry, recreation areas, and computer and phone access.
[10] See Maxine Bernstein, Federal Prison Workers File Suit Seeking Hazardous Pay After Guards Exposed to Coronavirus in Louisiana Lockup, The Oregonian (Mar. 30, 2020), https://bit.ly/2yr3pTD (BOP correctional officers from Oregon and Louisiana are named plaintiffs in a lawsuit that "alleges federal employees have been working in close proximity to people and surfaces infected with the novel coronavirus without sufficient protective gear since Jan. 27 and continue to do so."); Williams, 'Jails are Petri Dishes' ("[A] lawsuit filed late Friday asked the federal court in Brooklyn to order the immediate release of about 540 federal prisoners there identified as 'particularly vulnerable' to the virus because of their age or underlying health conditions.");\
[11] See, e.g., Mitch Smith, et al., Coronavirus in the U.S.: Latest Map and Case Count, N.Y. Times (Mar. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Mar. 30, 2020)
[12] Smith, *Coronavirus in the U..S.*
[13] Id.

Chicago M.C.C., it is logical to conclude that dangerous conditions exist here as well.

### III. Conclusion

This court can and should grant a hearing to determine if Joel Harris should be granted temporary release pending his sentencing. As detailed above, the court has the authority to grant this request. As described above, Joel Harris has medical problems and is 50 years old, which make a high risk to contract the Covid-19 virus. This could be fatal. At a hearing, Joel Harris will describe the conditions which he currently experiences every day. At the conclusion of that hearing, the defense requests that this court order the release of Joel Harris under the conditions described in the initial motion.

Respectfully submitted,

/s/Steven R. Hunter
Steven R. Hunter
Attorney for Joel Harris
900 West Jackson Blvd., Suite 5-W
Chicago, IL 60607
(312) 415-0661
srhunter@srhunterlaw.com

cc:   AUSA Jared Jodrey